[No. 14922. Department One. January 17, 1919.]

MATTA MILLER, *Administratrix etc., et al., Appellants,*
v. GREAT NORTHERN RAILWAY COMPANY,
*Respondent.*[1]

APPEAL (465)—REVIEW—HARMLESS ERROR—INSTRUCTIONS—CURE
BY VERDICT. In an action brought for wrongful death under the
Federal liability act, an instruction that contributory negligence
would be a defense is harmless error, where there was no evidence
of negligence to sustain any verdict for the plaintiff and the jury
found for the defendant.

MASTER AND SERVANT (55)—NEGLIGENCE—OPERATION OF RAIL-
ROADS—LOOKOUT—EVIDENCE—SUFFICIENCY. In an action under the
Federal liability act for the wrongful death of an employee, struck
by a train pulling into a station, there was no evidence of negli-
gence in the failure of the train crew to keep a lookout for the
deceased, where the undisputed testimony shows that the engineer
on the train kept a lookout except for two or three times when he
pulled his head into the cab because of snow flurries, and the fire-
man had his head out of the cab all of the time and kept a con-
stant lookout; especially where there was nothing to indicate that
failure to keep a lookout was the proximate cause of the death.

Appeal from a judgment of the superior court for
Spokane county, Huneke, J., entered January 2, 1918,
upon the verdict of a jury rendered in favor of the
defendant, in an action for wrongful death. Affirmed.

*Robertson & Miller* and *E. W. Robertson,* for ap-
pellants.

*Thomas Balmer* and *E. J. Prickett,* for respondent.

TOLMAN, J.—Appellant brought this action on be-
half of herself and her minor son, under the Federal
employers' liability act (Act of Congress, April 22,
1908, c. 149, § 2; 35 Stat. 65; U. S. Comp. St. §§ 8657-
8665) to recover damages for the death of her hus-
band, Thomas Miller, a Great Northern conductor,

[1]Reported in 177 Pac. 799.

who was killed at Browning, Montana, on the night of January 7, 1913. The case was tried to a jury, which found a verdict in favor of respondent, upon which judgment was entered, and from which this appeal is prosecuted.

Appellant assigns as error the giving of certain instructions, and has brought here as a part of the record a statement of facts, which is certified by the trial court to contain "all the material facts, matters and proceedings heretofore occurring in said cause, and not already a part of the record therein, in so far as the same is necessary to cover and explain instructions Nos. 6, 11, and 12, contained in the foregoing bill of exceptions."

The facts shown by this record are that, on the night of his death, Thomas Miller, the husband of appellant, rode "deadhead" into Browning, Montana, from Summit, a station twenty-four miles west, on a snow dozer in charge of conductor Dewar. A blinding snowstorm was raging, and the trains and snow-plows were being run a telegraph block apart to avoid collisions. Second No. 4, a first-class east-bound train, was held at Glacier Park, the first telegraph station west of Browning, until the arrival at Browning of the dozer was reported. Arriving there at about 10:35 p. m., conductors Dewar and Miller walked together to the telegraph office to report their arrival, so that orders could be given for second No. 4 to proceed from Glacier Park to Browning. Miller was present in the office, close to the operator, and heard the order transmitted. Miller then took charge of a Russell snow-plow standing on the passing track near the depot, being informed by the train master that he was to run with this snow-plow to Kipp and return to Browning ahead of second No. 4. The train mas-

ter asked the dispatcher to issue an order to Miller to carry out these instructions. While waiting for the order, it was reported that conductor Dewar, in attempting to turn his engine and snow dozer on the "Y," had become stalled, and the train master directed Miller to take his engine and assist Dewar through the snow-drift. This Miller proceeded to do, and thereafter told his brakeman to couple his engine back to the snow-plow, and he himself started to the telegraph office with the train master to get his orders. On their way there, the train master heard second No. 4 whistling on its approach from the west. Entering the telegraph office, they found an order for conductor Miller to run extra to Kipp and return to Browning, with rights over all trains. Miller signed this order, but under the railroad rules, it did not become effective until the operator had repeated it, with the conductor's signature, to the dispatcher, and had received from the dispatcher the word "complete," with the time. When so completed it was ready for delivery to the train crew, with a clearance stating that there were no further orders for them, upon receipt of which they could leave Browning.

While in the telegraph office, at the time Miller signed this order, there was present besides Miller and the train master, the operator who was just going off duty, and the operator who had just come on duty; and the testimony of all is in complete accord and to the effect that, just as Miller signed the order, the dispatcher asked the operator over the phone if he could see anything of second No. 4, and the operator replied, seeing the headlight of the approaching train from where he sat, "Second No. 4 is coming," or "She is coming now," or words to that effect. Miller

was standing where he could hear this conversation, and every one seems to have understood that second No. 4 was then coming in. Under these conditions, Miller said to the train master that he would go out and see if his crew was ready to start, and asked the train master to bring out the orders to him as soon as they were completed, to which the train master assented; and Miller went out of the door, pulling his cap down and turning up his coat collar as he went out. This was the last seen of Miller alive. The order for which he had been waiting was made complete at 11:20 p. m., two or three minutes after he left the office, and the train master took the order and a clearance card for delivery to Miller. In the short interval between Miller's passing out of the office and the completion of the order, second No. 4 had pulled into the station, and the engine had stopped about flush with the farther end of it. When the train master passed out with the orders and clearance card, he went around the front end of the engine on second No. 4, standing on the main track, to the snow-plow and engine in charge of Miller's crew on the passing track, but Miller was not there, and had not been seen by any member of his crew. A search was immediately instituted, which resulted in finding Miller's dead body lying under the pony trucks at the head of the engine on second No. 4. Marks made in the snow indicate that his body had been dragged a distance of some thirty or forty feet from the point where he was struck to that where the body was found. The men on the engine of second No. 4 testified as to the wind and flurries of snow interfering with their vision at times; that the whistle had been blown for the station and for an intervening crossing; that the bell was ringing at all times from

the west end of the yard until the train came to a stop; that the electric headlight was burning, and continued to burn until the train came to a full stop, though there was some evidence that it flickered and jumped just before the train reached the station. Both the engineer and the fireman kept their heads out for the purpose of looking ahead, except that, as the flurries of snow occurred, they temporarily withdrew behind the protection of the glass windows of the cab; and the fireman, also, in passing the coal chute and the water-tank on his side, kept his head within the cab for the purpose of avoiding contact therewith and with the icicles hanging from the water-tank. The engineer testifies that, from the time of passing the coal chute, located about 225 feet west of the station, until the train stopped, he pulled his head into the cab two or three times because of the snow flurries. And the fireman testifies that, from the time of passing the water-tank, which was about 150 feet west of the depot, he put his head out of the cab, kept it out, and maintained a constant lookout until the train stopped. Neither saw anything of Miller, or had any knowledge that he had been struck, until his dead body was found.

In answer to special interrogatories which were submitted, the jury found that the headlight was burning all the time until the train stopped at the station, that the bell was ringing, and continued to ring until the train stopped at the station, and further, that the deceased, Thomas Miller, at the time when he left the station on his way to his own train, knew that second No. 4 was in sight and approaching the station. The jury, however, failed to answer the interrogatories submitted upon the question of whether a proper lookout was maintained.

The first assignment of error relates to instruction No. 6, in which the jury was told that, if the deceased knew, or in the exercise of reasonable care should have known, of the approach of the train, either through the blowing of the whistle, the ringing of the bell, the light from the headlight, or by being told, then there was no negligence on the part of respondent for which recovery could be had. While this instruction would have stated the law in a case not brought under the Federal employers' liability act, here it was inapplicable because of the comparative negligence rule recognized by that act (35 Stat. 66; U. S. Comp. St. 1916, § 8659); and if there was evidence from which the jury might have found that respondent was negligent, appellant might still have been entitled to a verdict, notwithstanding knowledge on the part of the deceased of the approach of the train, because contributory negligence which would defeat a recovery under the state law might reduce the recovery under the Federal act, but would not necessarily defeat it. The special findings of the jury upon the questions of the burning of the headlight and the ringing of the bell eliminate all grounds of negligence charged except the single one of a failure to keep a lookout, and if there was no such failure, then the instruction, though erroneous, was harmless error.

Assuming that the duty exists upon a first-class train, coming into a station over the main line at a speed of two to four miles per hour, with the headlight burning and the bell ringing, to keep a lookout for employees of the company who knew of its approach, and whose duty it was to keep out of its way, which may well be doubted, the undisputed testimony here shows such lookout to have been maintained in as efficient a way as the elements, over which the

company had no control, would permit. And even on a night when a severe storm was raging, the proof as here shown contains no element of negligence, nor is the inference of negligence to be drawn from any fact shown. What further precautions could have been taken is not suggested, and it is difficult to imagine anything further which could have been done, unless the train was brought in under flag, and that certainly would be an unreasonable condition to impose where the surroundings were as they were shown to be here, with no public crossing intervening, and no danger to be apprehended to any one except the company's employees, whose duty it was to know of the approach of the train and to give it a clear track. Furthermore, if it were possible to draw an inference of negligence in this respect from the evidence, there is nothing to indicate that such negligence was the proximate cause of Miller's death. He might, and probably did, step into danger in such a manner and at such a time that, even if the engine crew had seen him, it would have been impossible to bring the train to a stop, or for them in any manner to have avoided the accident.

After a careful study of all of the testimony brought here, which is certified to be all that is material upon the point under discussion, we are satisfied that there was no conflict in the evidence as to the lookout maintained, and that the minds of reasonable men could not differ as to the conclusions to be drawn therefrom. The jury, by its answers to the special interrogatories, has resolved all of the other issues in the case against appellant, and since the court might, and should, have withdrawn the issue of whether a reasonable lookout was maintained, from the consideration of the jury, the error in the instruction given was harmless.

What has been said disposes of all of the other errors assigned. The jury was permitted to pass upon the only disputed questions of fact in the case, the verdict and answers to the interrogatories returned by it seem to be conclusions which were inevitable from the evidence submitted, and the judgment must be affirmed.

Judgment affirmed.

CHADWICK, C. J., MACKINTOSH, MITCHELL, and MAIN, JJ., concur.